**STATE of Texas DEPARTMENT OF HIGHWAYS AND PUBLIC TRANSPORTATION, Appellant,**

v.

**Jane Etta ZACHARY, et al., Appellees.**

**No. 09–91–060 CV.**

Court of Appeals of Texas, Beaumont.

Feb. 27, 1992.

Rehearing Denied March 12, 1992.

Don B. Morgan, Asst. Atty. Gen., Austin, for appellant.

Kenneth W. Lewis, Don Bush, Bush Lewis Ramsey & Roebuck, Beaumont, for appellees.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

WALKER, Chief Justice.

This appeal comes to us from the 60th Judicial District Court of Jefferson County, Texas, Honorable Gary Sanderson, Judge Presiding.

Jane Etta Zachary, for herself, the Estate of Merrick Zachary and as Next Friend of her four children, brought suit against the State Department of Highways and Public Transportation, W.H. Marmion and Modern Steel Building, Inc. for the death of Merrick Zachary from injuries received in a single vehicle automobile accident. The case was tried to a jury, verdict reached and judgment entered for plaintiffs against all defendants. The parties to this appeal are plaintiffs, now appellees, and the State Department of Highways and Public Transportation, appellant, referred to herein as "State" or appellant.

Factually, on the 4th day of May, 1987, Merrick Zachary was driving east in the 1200 block of West Cardinal Drive, on the south service road within the corporate limits of Beaumont, Texas. As Mr. Zachary passed a private driveway east of Hagner Road, he encountered standing water extending from the curb to the middle of the two east bound lanes. Driving into the water, Mr. Zachary lost control of his pickup truck, jumped the curb and struck a crane truck owned by Modern Steel Build-

ings. The impact brought about the death of Mr. Zachary. Relevant case facts were recorded in a diary maintained by a supervisor with the Jefferson County office of the Texas Department of Highways and Public Transportation, said entry dated May 4, 1987, which reads:

One vehicle accident on U.S. 69 south service road west of Avenue A. Reports are that car hit ponded water and struck a truck parked back of curb. Ponded water caused by expanded joint due to heat expansion. Joint had been repaired 4th month, 27, 87.

The Department supervisor of Roadway Maintenance Supervision in Jefferson County acknowledged that the involved area experienced previous flooding. This supervisor acknowledged that on 10 to 15 occasions, the Department had erected "Highway Flooded" signs when water extended into the left-hand lane of the access road. These warning signs were erected 700 feet in advance of the flooded area to provide motorists sufficient time to react.

The repair referenced in the Department's diary was designed to temporarily correct what is known as a "blowup" until permanent repairs could be made. Blow-ups occur in concrete roadways when concrete blocks of pavement expand during hot weather. Dirt and debris infiltrate the asphalt expansion joints during cold weather when the concrete contracts, rendering the asphalt non-pliable, and leaving insufficient space to absorb the concrete expansion. This results in the buckling of the concrete pavement creating small ramps of concrete at the roadway joints. The particular blowup in question was temporarily repaired on April 27, 1987 by the adding of asphalt to create a ramp that minimized the steepness of the blowup to provide a gentler transition for motorists.

The access road in question sloped down from the left to the right so that water drained to the outside right-hand lane, where drain inlets were located. The blow-up in question may have aggravated drainage prior to its repair, but its temporary repair created a dam-like effect which prevented the water from flowing to the drain.

When the Department sent its adjuster to the accident site on May 7, 1987 to investigate and photograph the area, the photographs revealed that the patch was like a dam which retained water and prevented water from reaching the drain inlet. The Department supervisor admitted that temporary patches were supposed to be made so as not to interfere with the normal drainage of the roadway and the bumps created by temporary repairs were not to be higher than two or three inches.

On the occasion in question, there was a single eye-witness, Jimmy Kohn, who was in another pickup truck travelling in the left lane about 60 to 100 feet behind the decedent who was travelling in the right lane. This witness testified that not only were he and decedent travelling at about 40 m.p.h., but they both were driving safely for the existing conditions. Mr. Kohn testified that he had driven this same route to work five days a week for 20 years and was travelling in the left lane because on other recent occasions, at this same location, he encountered standing water in the right lane so deep that it almost jerked the steering wheel from his hand when he hit it. Mr. Kohn's testimony revealed that on the day of the accident, the right lane was completely covered with a large amount of water that was at least three inches deep and at least to the top of the curb and out just past the centerline in the left lane. The Department maintenance supervisor estimated the curb to be about seven inches high at this location. Mr. Kohn testified that the water could not drain on this day because the patch, placed across the buckled concrete to make it smooth, ponded the water and thereby prevented drainage. When the decedent hit the ponded water, he lost control of his pickup truck.

On the day of the accident, Mr. Kohn had driven from his home in Bevil Oaks to the accident site on Cardinal Drive. Even though it started raining earlier that morning, and had rained "on and off" all day and "was raining all the way" in what he termed a downpour, Mr. Kohn did not pass through any other lanes of road covered with three inches of water. Furthermore,

Mr. Kohn experienced no instances of his steering wheel being jerked or almost jerked from his hand, and he did not have to avoid any other lanes because of standing water. Mr. Kohn also remembered seeing water standing at the buckled area when less rain had fallen. He also noted that it did not take a long period of heavy rainfall for water to accumulate there. Since the permanent repairs of June 5, 1987, Mr. Kohn states both the defect and the drainage are repaired, which enable him to drive in the right lane when it is raining.

Expert testimony revealed that when a sheet of water, during a rain storm, covers the roadway, it prevents a person from perceiving different depths of water at various locations, actually camouflaging the deep water. The water and its "sheeting" effect also hides the blowup and the repair patch giving a motorist no reason to suspect danger. According to other expert testimony, the decedent would have had exceeding difficulty in distinguishing the situation he encountered from a roadway free of defects. This expert testified that 40 m.p.h. would be a safe and reasonable speed for decedent if there were no dam and no collection of water.

We believe it significant to provide further excerpts provided by the testimony of appellees' experts as follows:

A blowup on a roadway rated for 50 m.p.h. travel, could constitute a dangerous condition on its own; the temporary repair of the blowup created a dam that prevented rain water from flowing to the drain, resulting in a dangerous condition on the roadway that amounted to an obstruction of the roadway for the motoring public at normal speeds; the dangers of ponding water were well understood by Department personnel; water covering an entire lane of travel and possibly getting into the adjacent lane is an abnormal and dangerous condition which a driver would not ordinarily expect or encounter; decedent's truck left the roadway as a result of torquing when he went over the patch-work repair and entered the deeper water; it is not a normal condition for water to be so deep on the public roadway as to almost jerk a steering wheel from a driver's hand; decedent encountered the ramp created by the patch just before he went down into the deepest part of the ponded water; the Department could have made a temporary repair that did not cause water to pond; ponding water of this severity was an abnormal condition on the roadway; the temporary repair aggravated the ponding of water; a reasonable alternative would have been a warning sign; the temporary repairs were inadequate to eliminate ponding; the ponding on the highway caused decedent to lose control of his truck; the ponding constituted both a dangerous condition and an obstruction of the roadway; the temporary patch did not eliminate the blowup, but did raise the height of the rise in the roadway; without a warning sign, there was nothing to alert the decedent to the dam and the ponded water; once decedent hit the ponded water, there was nothing he could do because there was not enough reaction time for evasive action at 40 m.p.h.

■ The State brings eight points of error with point of error number one alleging trial court error in the submission of both a premises defect question and subsequent questions inquiring of a special defect, without conditioning language preceding the special defect questions which permitted the jury to present the court with answers in irreconcilable and fatal conflict upon which the trial court erroneously entered judgment.

Plaintiffs brought their suit against the State pursuant to TEX.CIV.PRAC. & REM.CODE ANN. § 101.022 (Vernon 1986), alleging special, or in the alternative, premises defect theories of action.

TEX.CIV.PRAC. & REM.CODE § 101.022 provides as follows:

(a) If a claim arises from a premise defect, the governmental unit owes to the claimant only the duty that a private person owes to a licensee on private property, unless the claimant pays for the use of the premises.

(b) The limitation of duty in this section does not apply to the duty to warn of special defects such as excavations or obstructions on highways, roads, or streets or to the duty to warn of the absence, condition, or malfunction of traffic signs, signals, or warning devices as is required by Section 101.060.

The State objected to the submission of questions on both premises liability and special defect theories. The State requested and was denied conditioning language preceding the question submitted to the jury pertaining to special defects. Appellant contends that the refusal of the court to allow such conditioning language resulted in answers by the jury which present irreconcilable and fatal conflict. In Question No. 4, the jury was asked if the State negligently failed to warn of or make safe the dangerous condition to which the jury answered "No". Appellant contends that this answer should have ended the entire matter and that judgment should have been rendered for the defendant because of the plaintiffs' failure to meet the threshold burden of proof for a premises defect case. We disagree with the State's position.

The trial court correctly submitted the two theories of liability. In jury Question Nos. 1, 2, 3 and 4, the court inquired about a premises defect of which appellant had actual knowledge. Jury Question Nos. 5, 6, 7 and 8 inquired about a special defect of which appellant knew or should have known. In answer to Question No. 1, the jury found that a dangerous condition did exist on the roadway, however, in answer to jury Question No. 2, the jury failed to find that appellant had actual knowledge of the dangerous condition. The simple meaning of this finding was that appellees failed to prove appellant had actual knowledge of the dangerous condition and furthermore, that appellees failed to prove that the State had actual knowledge of the dangerous condition. (Question 3). In response to jury Question No. 4, the jury determined that appellees had not proven negligence or proximate cause against the State for failing to warn or make safe the dangerous condition. We find these answers to be consistent with not knowing about the con-

dition, since the standard applied here is a standard of actual knowledge.

In jury Question Nos. 5, 6, 7 and 8, the jury found that the condition of the roadway constituted an obstruction, about which appellant should have known and that the failure to warn of this hazard not normally connected with the use of a roadway was negligence and a proximate cause of the occurrence. These answers amounted to a finding for appellees on the theory of special defect. We find nothing whatsoever conflicting or irreconcilable about these jury findings.

The test for determining if an irreconcilable conflict exists was adopted by the Supreme Court in *Little Rock Furniture Manufacturing Co. v. Dunn*, 148 Tex. 197, 222 S.W.2d 985 (1949).

> To require a judgment entered on a verdict containing conflicting answers to be set aside, the conflict between the answers must be such that one answer would establish a cause of action or defense, while the other would destroy it.... "The test in such [a] case is, whether taking the finding alone in the one instance, a judgment should be entered in favor of the plaintiff; and taking it alone in the other, judgment should be entered in favor of the defendant."

*Id.* at 991.

In our case the jury found both a dangerous condition and an obstruction. The jury found that the State had no actual knowledge of the defect, but should have known about it. There are two different knowledge standards stated for premises defects and for special defects and in this case we find no conflict in the jury's verdict. Appellant's point of error number one is overruled.

■ Appellant's points of error two, three and four complain of trial court error in failing to define "obstruction"; in failing to distinguish the nature of the conditions comprising each type of defect resulting in a comment by the court on the weight of the evidence.

Appellant says that the jury was given no guidance in answering Question No. 5 which was submitted as follows:

On May 4, 1987, did the condition of the roadway in question constitute an obstruction?

Appellant contends that it was crucial for the trial court to give instructive guidance to the jury in answering Question No. 5 in that the common understanding of the word "obstruction" would encompass all of the suggested meanings, but not all of the suggested meanings would constitute a special defect as that term has been defined by the cases.

We suggest that the phrase "such as" contained in TEX.CIV.PRAC. & REM.CODE § 101.022(b), indicates that excavations and obstructions are but two examples of what may constitute a special defect. If the legislature had intended that this be an exclusive listing of what constitutes a special defect, we do not feel that the legislature would have used the phrase "such as". We find nothing in § 101.022(b) nor in case law which suggests that a special meaning or technical definition be given to a jury for finding an "obstruction".

We hold that the word "obstruction" is a common term capable of common understanding with no need of court instructed definitions. The court must only define legal or technical terms. TEX.R.CIV.P. 277; *Holmes v. Holmes*, 588 S.W.2d 674, 675 (Tex.Civ.App.—Beaumont 1979, no writ); *Green Tree Acceptance, Inc. v. Combs*, 745 S.W.2d 87, 89–90 (Tex.App.—San Antonio 1988, writ denied).

Appellant contends that it was error for the trial court to submit a question inquiring of the existence of a premise defect followed by a question inquiring of the existence of a special defect without distinguishing each. Appellant cites no authority for such a proposition. *See*, TEX. R.APP.P. 74(f). Furthermore, appellant's brief fails to include any argument or authority on point of error four. *Id.* We overrule appellant's points of error two, three and four.

■ Point of error number five contends that the trial court erred in submitting jury Question Nos. 5 and 7 because there was no evidence of a special defect.

Appellees, in their Second Amended Original Petition, alleged that the decedent "lost control of his vehicle because of unreasonably dangerous special defects of the roadway that amounted to an obstruction." Appellees further pleaded that "special defects in the roadway, each of which caused such accident, arose by reason of negligent construction, negligent maintenance, negligent inspection or negligent temporary repairs made by the state government defendants ..."

The submission of "special defect" was incorporated in jury Questions Nos. 5, 6, 7 and 8. The condition of the roadway involved the original blowup, the temporary repair and the standing water. Expert testimony provided that all of these conditions, or any combination thereof, could be found to be an obstruction as that word is used in connection with the term "special defect." Specifically, appellees' experts testified that the appellant's temporary repair of the blowup created a dam that prevented rain water from flowing to the drain thus resulting in an obstruction of the roadway for the motoring public at normal speeds, and that the dangers of the ponding of said rain water were well understood by personnel employed by appellant.

Appellant's arguments under these points of error essentially boil down to conclusory statements with references to places in the record where their expert witnesses contradicted appellees' expert witnesses. If this reduces appellant's complaints under these points of error to a swearing match between the parties' experts, so be it. We find sufficient evidence in the record before us for permitting submission of Questions 5 and 7 to the jury by the trial court. *See*, TEX.R.CIV.P. 278. Point of error five is overruled.

■ Although appellant groups points of error five and six together for presentation and argument in its brief, we feel that discussion of the issues raised under point six requires us to group it with the discussion of point of error seven. Point of error

six complains of trial court error in entering judgment based upon liability arising from a special defect because the condition complained of is not a special defect as a matter of law. Point of error seven alleges trial court error in submitting questions regarding the existence of a special defect to the jury as it is a question for the trial court to determine as a matter of law.

At first blush, appellant's brief seems to contradict itself in that in one portion it states, "The evidence showed that the water did not cover the entirety of one lane, much less both...." A bit later, appellant's brief provides, "The evidence in this case is that water either partially or totally covered only one lane of a two lane, single directional roadway. That is not evidence of a special defect as a matter of law." We admittedly are a bit puzzled as to which evidence appellant intends to rely upon to make its point. At any rate, if either of appellant's statements constituted the entirety of the evidence in this case, we would be tempted to agree with appellant that, as a matter of law, no evidence of "special defect" existed. As discussed in point of error five, however, there is ample evidence in the record before us to raise the issue of "special defect."

Recall that the trial court did not specifically inquire as to a "special defect." The inquiry was, "On May 4, 1987, did the condition of the roadway in question constitute an obstruction?" Section 101.022(b) offers a non-restrictive explanation of the abstract term "special defect" by using the wording "such as excavations or obstructions...." These are but two specific descriptions of hazardous conditions that are synonymous with the term "special defect" contained in the statute. This construction has been explicitly approved under the rule of *ejusdem generis*. *County of Harris v. Eaton*, 573 S.W.2d 177, 179 (Tex.1978). Furthermore, in *Park v. Troy Dodson Const. Co.*, 761 S.W.2d 98, 100 (Tex.App.—Beaumont 1988, writ denied), we quoted *Eaton's* observation that:

> ... [A]n excavation or obstruction need not have been created by the governmental unit itself.... Whether created by the governmental unit, by natu-

ral forces or by third persons, the dangerous condition on the roadway is the same. (citations omitted). Whether the pothole in this case was sufficiently large to constitute a special defect is an issue of fact to be resolved by the jury.

We interpret this statement by the Texas Supreme Court as saying that, so long as the issue has been properly pleaded and evidence exists of some sort of condition or circumstance that would constitute a "special defect," i.e. an obstruction, or excavation or like defect, the trial court has no choice but to submit a question to the jury as to whether or not the proven condition constituted a "special defect." Once the necessary pleading and proof exists, we find that it matters not whether the trial court submits the issue to the jury by using the abstract term "special defect" and then sets out the specific statutory wording which the abstract term embraces, or merely submits the issue by using one or more of the specific words contained in the statute which essentially define, albeit non-exclusively, the abstract term "special defect."

In the instant case, the trial court had no discretion to refuse to submit the issue of "special defect" to the jury after said issue had been properly pleaded and sufficient evidence introduced to support said pleadings. Tex.R.Civ.P. 278; *Moore v. Lillebo*, 722 S.W.2d 683, 686–687 (Tex.1986) [reversing for new trial because trial court failed to submit requested issues that were supported by some evidence]; *Brown v. Goldstein*, 685 S.W.2d 640, 641 (Tex.1985) [if issue is supported by more than a scintilla of evidence it must be submitted to the jury]. Thus, any determination "as a matter of law" by a trial court with regard to the existence or not of a condition amounting to a "special defect" is moot where the pleadings and evidence are firmly grounded in the language of § 101.022(b). The fact that the trial court concurred in the findings of the jury and stated so in his judgment is consistent with the above premise and is, essentially, icing on the cake. Points of error six and seven are overruled.

Appellant's final point of error suggests trial court error in failing to include the "reasonable man standard" in its definition of dangerous condition. The trial court submitted the following definition of "dangerous condition:"

Dangerous condition as used in this charge means a condition that creates an unreasonable risk of harm to a user of the roadway in question.

This definition is virtually identical to the one approved of by this Court in *State Dept. of Highways and Public Transportation v. King,* 795 S.W.2d 888, 894 (Tex. App.—Beaumont 1990), *writ denied per curiam,* 808 S.W.2d 465 (Tex.1991). Enough said. We overrule appellant's point of error eight.

The trial court's judgment is, in all things, affirmed.

AFFIRMED.