TEXAS DEPARTMENT OF TRANS-
PORTATION and Deavers, Inc.,
Appellants,

v.

Brenda L. FONTENOT, Individually and on Behalf of the Estate of Joseph Curry Fontenot, Deceased, Jason Fontenot, Micah Fontenot, and Robert Fontenot, Appellees.

No. 09–04–038 CV.

Court of Appeals of Texas,
Beaumont.

Submitted Sept. 23, 2004.

Decided Dec. 16, 2004.

Greg Abbott, Atty. General, Susan Desmarais Bonnen, Ronald E. Garner, Asst. Attys General, Austin, Kathleen M. Kennedy, Benckenstein, Norvell & Nathan, LLP, Beaumont, for appellants.

Rex Peveto, Peveto Law Firm, Orange, for appellee.

Before McKEITHEN, C.J., BURGESS and GAULTNEY, JJ.

## OPINION

STEVE McKEITHEN, Chief Justice.

The survivors of a motorist killed in a single vehicle automobile accident alleged that the injuries were caused by the failure of a highway contractor and the state highway department to warn motorists of water on the road following a rainstorm. Finding in favor of Brenda L. Fontenot, individually and on behalf of the Estate of Joseph Curry Fontenot, Jason Fontenot, Micah Fontenot, and Robert Fontenot ("Fontenot"), the jury apportioned negligence 55% to the Texas Department of Transportation ("TxDOT"), 30% to Deavers, Inc. ("Deavers"), and 15% to the deceased motorist. Nine issues are raised in this appeal.

A hard rain preceded the misting rain present when the accident occurred. A puddle of water stretched across both eastbound lanes near Milepost 879 of Interstate 10. Joseph Curry Fontenot was traveling east when his vehicle encountered the water in the highway. He lost control of the vehicle, which struck the concrete median, then jumped the guardrail on the right shoulder, flipped, and struck a tree. The appellees alleged that the water constituted a premises defect and a special defect for which TxDOT, as the State entity maintaining roads, was responsible. They also alleged that Deavers had a duty to place warning signs in the area where the accident occurred, and had failed to warn the traveling public of the water on the road.

In its first issue, Deavers contends it owed Fontenot no duty as a matter of law; therefore, it was error for the trial court to submit the issue of negligence to the jury, and error to overrule Deavers' motions for directed verdict and for judgment notwithstanding the verdict. Deavers does not dispute that it owed a duty to motorists traveling in its actual work zone; however, the accident occurred in the "advanced warning zone," the area of the highway designed to slow the traffic down before the actual construction site. Deavers claims that its only duty in the advanced warning zone was to give motorists advance warning of the construction zone ahead, and that it had no duty to warn of dangers it did not create.

Deavers' construction superintendent, Charles B. White, testified about the construction site and the contract between Deavers and TxDOT. Deavers built the Interstate 10 bridge over the Sabine River. White was responsible for the traffic control plan required by the construction contract. The accident occurred in the advanced warning zone. This area commenced near Milepost 878. The accident occurred in a 55 mile per hour zone at least 1,000 feet before the right shoulder closed as the road narrowed on the approach to the bridge. The transition zone, where Deavers reduced the number of traffic lanes, was located further up the road. The construction project did not include any highway repair or maintenance near Milepost 879.

The Fontenots contend Deavers assumed responsibility for warning the public of road hazards near Milepost 879. Deavers placed signs in the area, as required by its contract. Before reaching Milepost 879, Fontenot passed three signs erected by Deavers that notified the public that the area was a work zone. Under the Transportation Code, "Construction or maintenance work zone" means a portion of a highway or street where highway construction or maintenance is being undertaken, other than mobile operations as defined by the Texas Manual on Uniform Traffic Control Devices, and that is marked by signs indicating that it is a construction or maintenance work zone. *See* Tex. Transp. Code Ann. § 472.022(e)(2) (Vernon Supp.2004). The Fontenots argue that, because the area was a work zone, the construction contract required Deavers to place a "Watch for Water on Road" sign in areas where wet weather conditions normally result in a temporary condition of ponding or flowing water on the roadway.

■ The Fontenots rely on Item 502 of the contract, the first paragraph of which provides as follows:

The signs, barricades and markings shown on these drawings constitute minimum requirements and are not intended to cover special circumstances or other conditions that may arise due to unforseen field conditions. The contractor shall place and maintain sufficient additional signs, barricades and warning devices to warn the public and provide for the safe movement of both vehicular and pedestrian traffic. At any time during the execution of this project, if other traffic control devices are deemed necessary to control and provide safety for project personnel and the traveling public, the contractor shall provide these additional traffic control devices as approved and/or directed by the en-

gineer. These shall conform to TxDOT standards and the "Texas Manual of Uniform Traffic Control Devices for Streets and Highways", 1980 Edition. Additional work will not be paid for directly, but will be subsidiary to Bid Item 502.

Item 502 was modified by the following Special Provision:

For this project, Item 502, "Barricades, Signs, and Traffic Handling", of the Standard Specifications, is hereby amended with respect to the clauses cited below and no other clauses or requirements for this Item are waived or changed hereby.

Article 502.2. *Construction Methods* The first paragraph is voided and replaced by the following:

All barricades, signs and other types of devices listed above shall conform to the requirements of the plans, the Texas Manual on Uniform Traffic Control Devices (TMUTCD) and the Compliant Work Zone Traffic Control Devices (CWZTCD) list. In cases of disagreement between these documents, the CWZTCD list shall govern over plans, and the TMUTCD shall govern over both the CWZTCD list and plans.

The contract's General Notes and Specification Data included the following:

The existing roadway within the limits of the project will be maintained by the contractor in a manner that is acceptable to the engineer. This work will not be paid for directly, but shall be considered subsidiary to the various bid items. State forces will maintain the existing section of highway and its appurtenances not a part of this project, except for those sections damaged by the contractor's forces. The contractor shall be required to furnish materials and make repairs to these sections that might be

damaged by construction operations. This work shall be done in a manner satisfactory to the Department, and shall not be paid for directly but shall be considered subsidiary to the various bid items.

. . . .

The contractor shall maintain adequate drainage throughout the limits of the project during all construction phases.

The plan sheets contained in the contract included the following statement:

The contractor shall provide and erect barricades and construction signs in accordance with BC (1–9C)—98 (M) and the Texas Manual on Uniform Traffic Control Devices at points as shown on plan sheets and as directed by the engineer.

Standard Specifications incorporated into the contract by reference stated, in part:

The safety of the public and the convenience of traffic shall be regarded as of prime importance. Unless otherwise shown on plans or except as herein provided, all portions of the highway shall be kept open to traffic. It shall be the entire responsibility of the Contractor to provide for traffic along and across the highway, as well as for ingress and egress to adjacent property, in accordance with the traffic control plan and detours as shown on the plans and in the specifications for the project or as directed/approved by the Engineer.

The Contractor shall plan and execute his operations in a manner that will cause the minimum interference with traffic. The Contractor shall secure the Engineer's approval of his proposed plan of operation and sequence of work. If at any time during construction the approved plan does not accomplish the intended purpose due to weather or other conditions affecting the safe handling of traffic, the Contractor shall immediately make necessary changes as directed/approved by the Engineer therein to correct the unsatisfactory conditions.

. . . .

The Contractor shall have the sole responsibility for providing, installing, moving, replacing, maintaining, cleaning and removing upon completion of work all barricades, warning signs, barriers, cones, lights, signals and other such type devices and of handling traffic as shown on the plans or as directed/approved by the Engineer. All barricades, warning signs, barriers, cones, lights, signals and other such type devices shall conform to details shown on the plans or those indicated in the TMUTCD.

The Contractor may provide special signs not covered by he plans to protect the traveling public against special conditions or hazards, provided, however, that such signs are first approved by the Engineer.

It is apparent from the language cited that Deavers' duties are to warn motorists of danger and to maintain the roadway extended to the limits of the project, not beyond it. The duty to place warning signs at intervals commencing with Milepost 878 arose from the traffic control plan. Nothing within the contract required Deavers to either maintain the roadway or warn the public of hazards located outside of the limits of the project unless Deavers caused the condition. According to the first page of the contract, the project began at Station 0 + 430.162. The traffic control plan began before Station 0 + 350, and called for the placement of three "Work Zone" signs well before the actual project area began at Station 0 + 430.162. Therefore, the traffic control plan called for sign placement outside the boundary of the project itself, and the fact

that Deavers placed signs required by the contract does not create an additional legal duty to warn the traveling public of hazards located outside the actual construction zone.

■■■ The Fontenots also contend that Deavers owed an extra-contractual duty to the traveling public. In determining whether a defendant owed a duty to the injured party, we consider the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant. *See Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex.1983). Anyone working upon or using a highway is under a duty to refrain from creating conditions which are dangerous to other persons using the same, or to warn of dangerous conditions should the same be created. *Strakos v. Gehring*, 360 S.W.2d 787, 803–04 (Tex.1962) (opin. on reh'g). "If a party negligently creates a dangerous situation, it must act to prevent foreseeable injury to others, but a mere bystander who did not create the dangerous situation is not required to become the good Samaritan and prevent injury to others." *Buchanan v. Rose*, 138 Tex. 390, 159 S.W.2d 109, 110 (1942). The appellees argue that imposition of a duty is justified in this case because Deavers' employees were aware that water frequently pooled in that area, the water was not apparent to approaching traffic because of a sweeping curve in the road, and Deavers owed a contractual duty to place signs in the area, so the additional duty to warn of hazards in this area of the highway would not be burdensome. There is, however, no evidence that Deavers created the condition, or that they gratuitously assumed the burden of maintaining the road near Milepost 879. The signs Deavers placed in the advanced warning zone

concerned hazards related to the bridge project further down the road. There is no evidence that Deavers breached any duty to Fontenot, that it exercised any control over the accident site, or that it undertook to warn motorists of hazards associated with the accident site.

We hold that Deavers owed no duty to Joseph Curry Fontenot. Therefore, the trial court erred in submitting an issue on Deavers' negligence to the jury. Issue one is sustained. Because Deavers is entitled to a rendition of judgment on the issue of duty, we do not address appellant's remaining points of error.

■■■ In the first of its five issues, TxDOT argues that as a matter of law the water on the road was not a special defect. In its second issue, TxDOT contends legally and factually insufficient evidence of TxDOT's actual knowledge of the water on the roadway precludes recovery on the premises defect theory. A governmental unit is liable for personal injury and death caused by a condition of real property if the State would be liable if it were a private person. TEX. CIV. PRAC. & REM.CODE ANN. § 101.021(2) (Vernon 1997). For a claim arising from a premises defect, the governmental unit owes to the claimant only the duty that a private person owes to a licensee on private property. TEX. CIV. PRAC. & REM.CODE ANN. § 101.022(a) (Vernon 1997). The duty owed to a licensee is not to injure the licensee by willful, wanton, or grossly negligent conduct, and to make reasonably safe a dangerous condition of which the premises owner is aware but the licensee is not. *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 237 (Tex.1992). The limitation of duty in Section 101.022(a) does not apply to the duty to warn of special defects such as excavations or obstructions on highways. TEX. CIV. PRAC. & REM.CODE ANN. § 101.022(b)

(Vernon 1997). "That duty requires an owner to use ordinary care to reduce or eliminate an unreasonable risk of harm created by a premises condition of which the owner is or reasonably should be aware." *Payne*, 838 S.W.2d at 237. Thus, a licensee must prove that the premises owner actually knew of the dangerous condition, while an invitee need only prove that the owner knew or reasonably should have known, and a licensee must prove that he did not know of the dangerous condition, while an invitee need not do so. *Id.*

 "Whether a condition is a premise defect or a special defect is a question of duty involving statutory interpretation and thus an issue of law for the court to decide." *Id.* at 238. Fact situations are classified on a case-by-case basis. *Corbin v. City of Keller*, 1 S.W.3d 743, 747 (Tex. App.-Fort Worth 1999, pet. denied). Special defects are excavations or obstructions that present an unexpected and unusual danger to ordinary users of roadways. *State Dep't of Highways & Pub. Transp. v. Kitchen*, 867 S.W.2d 784, 786 (Tex.1993). Longstanding, routine, or permanent conditions are not special defects. *Stokes v. City of San Antonio*, 945 S.W.2d 324, 326–27 (Tex.App.-San Antonio 1997, no writ). In *Kitchen*, the court held that an icy bridge during cold, wet weather is not unexpected or unusual but something a motorist should expect. *Kitchen*, 867 S.W.2d at 786. Likewise, a flash flood at a low-water crossing is entirely predictable to the ordinary motorist traveling in inclement weather. *Corbin*, 1 S.W.3d at 747. Potholes and ruts in an unpaved road in a creek bottom after recent rain are neither unusual nor unexpected. *Harding v. Kaufman County*, 119 S.W.3d 428, 434 (Tex.App.-Tyler 2003, no pet.). Due to its visibility, water in a street gutter constitutes a premises defect, not a special defect. *City of Fort Worth v. Gay*, 977 S.W.2d 814, 819 (Tex.App.-Fort Worth 1998, no pet.). Water on the road is open and obvious and a condition that an ordinary motorist could have anticipated due to the weather conditions, where the evidence shows it had been raining all day. *Villegas v. Texas Dep't of Transp. & Rekca, Inc.*, 120 S.W.3d 26, 32–33 (Tex.App.-San Antonio 2003, pet. denied). On the other hand, two feet of water across a state highway constitutes an obstruction and is a special defect. *Miranda v. State*, 591 S.W.2d 568, 570 (Tex.Civ.App.-El Paso 1979, no pet.). We held a special defect negligence submission was appropriate in *State Dep't of Highways & Pub. Transp. v. Zachary*, 824 S.W.2d 813, 816–17 (Tex. App.-Beaumont 1992, writ denied), where a ramp installed as a temporary road repair prevented rainwater from flowing to the drain and created a standing pool that obscured the buckled concrete beneath.

 TxDOT contends the facts of this case establish that the condition of the water on the road was not a special defect. The Fontenots argue that four inches of water across an interstate highway is virtually invisible, and would be unexpected with a misting rain and only one-half inch of accumulated rainfall. An eyewitness to the accident testified it had rained hard that morning, and there was misting rain at the time of the accident. That witness noticed the water just as he came upon it and successfully tapped his brakes, but Fontenot's vehicle hydroplaned. According to Department of Public Safety Sergeant Douglas Heigley, thousands of vehicles traverse Interstate 10 each day. The road along the concrete median near milepost 879 collects water when heavy downpours occur. On this day, the water drained off the lanes of travel within an hour after the accident. Although the rain had lightened, on a rainy day standing

water on the road is neither outside the ordinary course of events nor contrary to routine expectation. The accumulated water did not constitute an obstruction, as the vehicles traveling on Interstate 10 were able to pass through the area. Although dangerous, the temporary presence of four inches of water on the highway did not present an unexpected or unusual road hazard during inclement weather. As a matter of law, the condition did not constitute a special defect under Section 101.022(b). Issue one is sustained. We do not reach the third issue which challenges the legal and factual sufficiency of the evidence supporting the jury's verdict on the special defect question.

Next, TxDOT challenges the jury's verdict on the regular premises defect. In reviewing a no evidence point, we must view the evidence in a light that tends to support the finding of the disputed fact and disregard all evidence and inferences to the contrary. *State ex rel. State Dep't of Highways & Pub. Transp. v. Gonzalez,* 82 S.W.3d 322, 327 (Tex.2002). A no evidence point will be sustained when the evidence offered to prove vital fact is no more than a mere scintilla. *Merrell Dow Pharmaceuticals, Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id.* In a factual sufficiency challenge, we consider all of the evidence including that which is contrary to the verdict. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951). We may sustain a factual sufficiency point only if we determine that the challenged finding is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.* The duty to warn a licensee of a dangerous

condition arises only when the licensor has actual, not constructive, knowledge of the condition. *State v. Tennison,* 509 S.W.2d 560, 562 (Tex.1974). TxDOT is not liable unless it had actual knowledge of an unreasonably dangerous condition on its premises. TxDOT contends there is no evidence it possessed actual knowledge of the pooled water on the highway on the date of the accident. In the alternative, TxDOT argues the evidence of actual knowledge is factually insufficient.

The appellees rely upon the testimony of two Department of Public Safety troopers to establish TxDOT's actual knowledge of the premises defect. Heigley testified that he patrolled in Orange for eight years, and that he had worked at least twenty accidents in the area near Milepost 879. According to Heigley, numerous accidents have occurred because an area along the concrete dividing wall on the inside lane collects water when heavy downpours occur. The condition contributed to several accidents before this one. Heigley thought TxDOT may have assisted in shutting down the highway in the past. Heigley testified, "We know when it rains hard, we're going to have an accident eastbound Interstate 10 at the 879." In reporting Fontenot's accident, Heigley filed a report with his immediate supervisor, who passed the report on to a TxDOT office.

Also testifying was Trooper Ronnie Fikes, who did not participate in the investigation of this accident. Before 1994, during an accident investigation near Milepost 879, a TxDOT vehicle was struck by a vehicle that lost control. As early as 1994, Trooper Fikes investigated accidents near Milepost 879 in which standing water was a factor. Although he could not recall if TxDOT assisted at any of those accidents, TxDOT routinely helps with traffic control when there has been an accident. Fikes

testified that TxDOT was aware prior to 2001 that water would stand or pool on Interstate 10 near Milepost 879. Fikes explained that he personally talked with several of the workers, and there is a form that is sent through channels to advise the highway department of problem areas.

Gene Weldon Hughey, a carpenter for Deavers, testified that one of his responsibilities is to check the traffic barricades. He was aware that water would stand or pool on Interstate 10 near Milepost 879. Hughey did not notify anyone at Deavers or TxDOT about the standing water, but he said everybody knew. On the morning of the accident, Hughey rode around to make sure that all of the barrels were in place before the project was shut down for the day due to rain. Hughey told his supervisor that the road was wet. Deavers' construction superintendent, Charles White, testified that he did not tell anyone from the State or TxDOT to warn motorists of water on the road. White noted that water puddled on all the asphalt highways in the area.

TxDOT's employees denied having actual notice of the site's propensity to pool water. Ricky Gandy, the TxDOT project inspector working on the Sabine River bridge, testified that no one from Deavers ever informed him about rainwater pooling at Milepost 879. He personally had never observed the phenomenon and was unaware of the problem. Mark Cox, an assistant roadway maintenance supervisor for TxDOT, testified that he had never sent maintenance crews to look for water puddling on Interstate 10, and that he checked the interstate highway personally. According to Cox, he has never seen water on the road in the Milepost 879 area, and no one has ever informed him of water standing there. After the accident, a TxDOT crew went out to the site to clear the storm drains in the center of the high-way. John Snoddy, TxDOT's district maintenance supervisor, testified that he is the person who would have been called about any hazards on the highway, and no one informed him that water would stand or pool on the interstate near Milepost 879. Sweepers periodically swept the median, but he sent no one out to check the drains until after Fontenot's accident. Snoddy then checked the drains and had them cleaned of debris. The highest ranking TxDOT employee to testify, the area engineer Clark Slacum, testified that his responsibilities include planning and design as well as maintenance of all of the highways in the area. No one called him about that area of the highway before the accident at issue in the trial and he was personally unaware of it. He sent crews out during rain specifically to look for water hazards, but no one ever reported a problem at that spot. Remedial measures taken as a result of the accident included erecting "Watch For Water On Road" signs, improving the design of the drainage system, and changing the road surface texture to improve traction. As a practical matter, even the improved design had to allow for some ponding.

Trooper Fikes' testimony that TxDOT was aware that prior to 2001, water would stand or pool at the location in question, together with Trooper Heigley's testimony that numerous accidents have occurred because water collects during heavy precipitation and that the accidents are reported to TxDOT, are some evidence that TxDOT possessed actual knowledge that an unreasonably dangerous condition existed on Interstate 10 near Milepost 879. TxDOT contends the evidence cannot support a finding that TxDOT had actual knowledge of the roadway's condition at the time of the accident. The precedents relied upon by TxDOT are distinguishable. In *State v. Gonzalez*, 82 S.W.3d 322, 330 (Tex.2002), TxDOT's knowledge that stop signs at a

particular intersection had been repeatedly vandalized did not indicate that TxDOT actually knew the signs were down at the time of the accident. Here, there is evidence that the condition occurred every time it rained hard, and there was evidence that it had rained hard before the accident. In *Villegas v. Texas Department of Transportation,* 120 S.W.3d 26, 34 (Tex.App.-San Antonio 2003, pet. denied), summary judgment evidence established that TxDOT was responsible for the maintenance of the road, and that a TxDOT employee conducted routine patrols of the area to determine when to mow the grass along the highway, and photographs revealed overgrown vegetation along the shoulder and culvert at the time of the accident, but established neither awareness of the condition on the date of the accident nor that the overgrown vegetation had caused flooding in this particular area before the date of the accident. Here, Trooper Fikes flatly stated that TxDOT knew of the condition before the accident. In *Martinez v. City of Lubbock,* 993 S.W.2d 882, 886 (Tex.App.-Amarillo 1999, pet. denied), the city knew water meter hole covers were frequently stolen, but no evidence supported an inference that the city knew that the particular meter hole in which the plaintiff fell was uncovered. Here, the issue concerns evidence of a recurring condition at a particular location.

There is some evidence that TxDOT was aware that the condition had contributed to numerous accidents, because the Department of Public Safety passed the accident reports on to the TxDOT. TxDOT employees were nearby on the day of the accident, and the jury could reasonably have inferred that TxDOT personnel were aware that it was raining at the time of Fontenot's accident. In light of Trooper Heigley's testimony that the troopers knew that there would be an accident at that spot when it rained hard, and in light of Trooper Fikes' testimony that a form sent through channels advises TxDOT of problem areas, there is more than a scintilla of evidence to support a finding of actual knowledge of the condition of water on the road posing an unreasonable risk of harm. We conclude that the evidence is legally sufficient to support the jury's verdict as to that element.

■ A neutral review of the troopers' testimony reveals the weakness of the evidence of TxDOT's actual knowledge of the condition of the water on the road. Although a procedure was in place for the Department of Public Safety to notify TxDOT when a dangerous condition on the road contributed to an accident, the appellees did not produce any evidence that any of the numerous accidents that occurred in this location were actually reported to TxDOT. Although TxDOT routinely assists with traffic control after accidents, the troopers could not definitely place TxDOT at any of the accidents at this particular scene, with the exception of one accident that involved a TxDOT vehicle. A single accident on a busy interstate highway does not constitute notice of a recurring condition. The Deavers' employee who checked the traffic barricades was aware of the ponding water that day, but he did not tell TxDOT. Although he testified that "everybody knew" of the propensity for water to collect at that spot, the witness did not testify as to how TxDOT was made aware of the condition. We conclude that the evidence is factually insufficient to support the jury's finding of actual knowledge of the condition of water on the road posing an unreasonable risk of harm. Issue two is overruled in part and sustained in part.

■ In its fourth issue, TxDOT contends the evidence is legally and factually insufficient that the negligence of

TxDOT proximately caused the accident. TxDOT does not challenge the jury's finding that the condition of water on the road posed an unreasonable risk of harm, nor does the appellant direct the court's attention to any evidence in the record to support an argument that it had made the condition reasonably safe. TxDOT does not challenge the appellees' claims that the drain had clogged and that TxDOT could have made the road safer by maintaining the drain. Instead, the appellant argues that the Fontenots failed to prove that the accident would not have occurred had it posted a "Watch for Water on Road" sign. It would seem that if a warning sign would not have protected the motorist from harm, the appellant could not have discharged its duty by giving an inadequate warning and would have had to make the condition reasonably safe in some other manner. Be that as it may, in product liability cases involving failure to warn, we presume the warnings would have been followed had they been provided. *General Motors Corp. v. Saenz*, 873 S.W.2d 353, 358–59 (Tex.1993). The same presumption was applied in *Barron v. Texas Department of Transportation*, 880 S.W.2d 300, 304 (Tex.App.-Waco 1994, writ denied). In that case, TxDOT overcame the presumption because the motorist testified that had there been a warning sign on the highway before the bridge, she would have done nothing differently. Here, the appellees offered evidence that Fontenot was a cautious driver and he obeyed the speed limit sign in this instance. The jury could infer that Fontenot would have reacted to a warning sign by slowing down and he could have maintained control of the vehicle had he been prepared to encounter standing water. In addition, TxDOT offered evidence of subsequent remedial measures, which included installing "Watch for Water on Road" signs, cleaning out debris accumulated in the drainage system, and installing more and larger drains on the inside of the curve in the road. No accidents occurred at the location after the subsequent remedial measures were accomplished. The jury could have found that TxDOT could have acted that day to adequately warn of the condition or to make the condition reasonably safe. Because we find the evidence relating to causation to be both legally and factually sufficient, issue four is overruled.

 In issue five, TxDOT says the trial court abused its discretion in allowing an exhibit already in evidence to be altered, and in refusing to allow the jury to view or consider the evidence as admitted. We agree with TxDOT. A trial court cannot alter documents that have been exhibited to the jury and admitted into evidence. Here, TxDOT relied on the fact that the police report showing that Fontenot had been partially ejected from his automobile had been introduced by Fontenot and duly admitted as one of its exhibits. The following exchange occurred during trial:

Q. [Defense Counsel]: And as part of your investigation, you ascertained that Mr. Fontenot had been partially ejected from the vehicle?

[Plaintiff's Counsel]: Your Honor, I need to object to this line of questioning. May we approach the Bench, please?

THE COURT: All right.

(At the Bench, on the record)

[Plaintiff's Counsel]: Your Honor, that's the second time. We've already had a motion in limine that's been to prevent any types of statement recorded either wearing or not wearing his seat belt.

[Defense Counsel]: I'm not—all I'm doing is—he's already put it into evidence in the accident report and flashed it before the jury where it says on the

accident report he was partially ejected. It's already in evidence.

THE COURT: All right.

(Proceedings continue to jury)

Q. [Defense Counsel]: Sergeant Heigley, you prepared your accident report in the course of your official business for the State of Texas, correct, sir?

A. Yes, sir.

Q. [Sergeant Heigley]: And the information you put in there is true and accurate, to the best of your ability; is that fair?

A. Yes, sir.

Q. Because you know that if litigation results that your accident report may be poured [sic] over with a fine-toothed comb?

A. Yes, sir.

Q. And as a part of your investigation, you did ascertain that Mr. Fontenot had been partially ejected from his vehicle; is that correct?

A. Yes, sir, he was partially ejected.

The accident report as admitted into evidence showed no seatbelt was worn. A later witness was asked whether an individual's failure to fasten a seatbelt was a failure to pay attention to signs and take individual responsibility. During deliberations, the jury asked the court: "Can we have the information if he was wearing a seatbelt. The police report is not filled in on the spot." One of the jury's questions during deliberations indicates the jury wanted access to the evidence. This indicates the error was harmful. Issue five is sustained.

We conclude that Civil Practice and Remedies Code Section 101.022(b) does not apply in this case and thus does not waive the State's immunity. We further conclude that Section 101.022(a) of the Tort Claims Act is the section that does apply, and that more than a scintilla of evidence supports the knowledge and causation elements of the appellees' negligence claim. However, because we find there is insufficient evidence that TxDOT had actual notice of a dangerous accumulation of water on the highway before the accident occurred, the trial court erred in denying TxDOT's motion for new trial. We further conclude that the trial court erred in submitting the issue of Deavers' negligence to the jury, as Deavers, Inc. owed no duty to Joseph Curry Fontenot. Accordingly, we reverse the judgment of the trial court, render judgment that Brenda L. Fontenot, individually and on behalf of the Estate of Joseph Curry Fontenot, Jason Fontenot, Micah Fontenot, and Robert Fontenot, take nothing as to Deavers, Inc. Because we uphold the legal sufficiency of the evidence supporting the plaintiffs' regular premises defect theory of liability as applied to the Texas Department of Transportation, but find the evidence to be factually insufficient, we remand the case to the trial court for further proceedings consistent with this opinion.

REVERSED AND RENDERED IN PART; REMANDED IN PART.

DON BURGESS, Justice, concurring and dissenting.

I concur with the majority's resolution as to Deavers, Inc., and that portion of TXDOT's issue two that upholds the legal sufficiency of the regular premises defect, but respectfully dissent to the majority's resolution of issues one, three, four, five and that part of issue two that finds the evidence of a regular premise defect factually insufficient.

### Issues One and Three

The majority acknowledges this court's opinion in *State Dept. of Highways and Public Transp. v. Zachary,* 824 S.W.2d 813 (Tex.App.-Beaumont 1992, writ denied),

but claims "the temporary presence of four inches of water on the highway did not present an unexpected or unusual road hazard." This belies their own statement of facts. They acknowledge it was only "misting rain at the time of the accident." Is it reasonable to expect four inches of water on the highway during a misting rain? Absolutely not! The water was that deep only because the drain in that area habitually collected debris and did not allow proper drainage. There was ample evidence that TXDOT was aware of this condition.

In *Zachary*, 824 S.W.2d at 815–16, we noted:

> On the occasion in question, there was a single eye-witness, Jimmy Kohn, who was in another pickup truck travelling in the left lane about 60 to 100 feet behind the decedent who was travelling in the right lane. This witness testified that not only were he and decedent travelling at about 40 m.p.h., but they both were driving safely for the existing conditions. Mr. Kohn testified that he had driven this same route to work five days a week for 20 years and was travelling in the left lane because on other recent occasions, at this same location, he encountered standing water in the right lane so deep that it almost jerked the steering wheel from his hand when he hit it. Mr. Kohn's testimony revealed that on the day of the accident, the right lane was completely covered with a large amount of water that was at least three inches deep and at least to the top of the curb and out just past the centerline in the left lane. The Department maintenance supervisor estimated the curb to be about seven inches high at this location. Mr. Kohn testified that the water could not drain on this day because the patch, placed across the buckled concrete to make it smooth, ponded the water and thereby prevented drainage. When the decedent hit the ponded water, he lost control of his pickup truck.
>
> On the day of the accident, Mr. Kohn had driven from his home in Bevil Oaks to the accident site on Cardinal Drive. Even though it started raining earlier that morning, and had rained "on and off" all day and "was raining all the way" in what he termed a downpour, Mr. Kohn did not pass through any other lanes of road covered with three inches of water. Furthermore, Mr. Kohn experienced no instances of his steering wheel being jerked or almost jerked from his hand, and he did not have to avoid any other lanes because of standing water. Mr. Kohn also remembered seeing water standing at the buckled area when less rain had fallen. He also noted that it did not take a long period of heavy rainfall for water to accumulate there. Since the permanent repairs of June 5, 1987, Mr. Kohn states both the defect and the drainage are repaired, which enable him to drive in the right lane when it is raining.
>
> Expert testimony revealed that when a sheet of water, during a rain storm, covers the roadway, it prevents a person from perceiving different depths of water at various locations, actually camouflaging the deep water. The water and its "sheeting" effect also hides the blow-up and the repair patch giving a motorist no reason to suspect danger. According to other expert testimony, the decedent would have had exceeding difficulty in distinguishing the situation he encountered from a roadway free of defects. This expert testified that 40 m.p.h. would be a safe and reasonable speed for decedent if there were no dam and no collection of water.
>
> We believe it significant to provide further excerpts provided by the testimony of appellees' experts as follows:

A blowup on a roadway rated for 50 m.p.h. travel, could constitute a dangerous condition on its own; the temporary repair of the blowup created a dam that prevented rain water from flowing to the drain, resulting in a dangerous condition on the roadway that amounted to an obstruction of the roadway for the motoring public at normal speeds; the dangers of ponding water were well understood by Department personnel; water covering an entire lane of travel and possibly getting into the adjacent lane is an abnormal and dangerous condition which a driver would not ordinarily expect or encounter; decedent's truck left the roadway as a result of torquing when he went over the patch-work repair and entered the deeper water; it is not a normal condition for water to be so deep on the public roadway as to almost jerk a steering wheel from a driver's hand; decedent encountered the ramp created by the patch just before he went down into the deepest part of the ponded water; the Department could have made a temporary repair that did not cause water to pond; ponding water of this severity was an abnormal condition on the roadway; the temporary repair aggravated the ponding of water; a reasonable alternative would have been a warning sign; the temporary repairs were inadequate to eliminate ponding; the ponding on the highway caused decedent to lose control of his truck; the ponding constituted both a dangerous condition and an obstruction of the roadway; the temporary patch did not eliminate the blowup, but did raise the height of the rise in the roadway; without a warning sign, there was nothing to alert the decedent to the dam and the ponded water; once decedent hit the ponded water, there was nothing he could do because there was not enough reaction time for evasive action at 40 m.p.h.

There is simply no logical or legal reason to hold that three inches of water ponding is a special defect and then hold four inches of water ponding is not a special defect[1]. Even if the reason for the ponding is different, the basic facts are

1. As noted in *Texas Dept. of Transp. v. Horrocks*, 841 S.W.2d 413, 417 (Tex.App.-Dallas 1992), *rev'd on other grounds*, 852 S.W.2d 498 (Tex.1993):

Courts have deemed holes, ice, brush, mud, water, a traffic signal base, and an unmarked termination of a dead end street to be 'special defects' for purposes of the Texas Tort Claims Act as it applies to highways, roads, or streets.[4] . . .

4. *See, e.g., Harris County v. Eaton*, 573 S.W.2d 177, 178–80 (Tex.1978) ("chughole" that varied from six to ten inches in depth and extended over ninety percent of the width of the highway); *State Dep't of Highways v. Kitchen*, 840 S.W.2d 505, 507–08 (Tex.App.-Corpus Christi, n.w.h.) (en banc) (ice on bridge); *State Dep't of Highways v. Zachary*, 824 S.W.2d 813, 816–17 (Tex.App.-Beaumont 1992, writ requested) (standing water); *City of San Antonio v. Schneider*, 787 S.W.2d 459, 466–68 (Tex. App.-San Antonio 1990, writ denied) (wet, slippery road); *Chappell v. Dwyer*, 611 S.W.2d 158, 161 (Tex.Civ.App.-El Paso 1981, no writ) (large brush hiding arroyo); *State v. Nichols*, 609 S.W.2d 571, 573 (Tex. Civ.App.-Waco 1980, writ ref'd n.r.e.) (caved-in portion of highway, three to five feet wide and three to four feet deep); *State v. McBride*, 601 S.W.2d 552, 558 (Tex.Civ. App.-Waco 1980, writ ref'd n.r.e.) (slick and muddy condition of road under repair); *Miranda v. State*, 591 S.W.2d 568, 569 (Tex. Civ.App.-El Paso 1979, no writ) (two feet of floodwater); *Andrews v. City of Dallas*, 580 S.W.2d 908, 909–11 (Tex.Civ.App.-Eastland 1979, no writ) (base of traffic signal extending 26 inches above street level and located six inches from traveled portion of highway); *City of Houston v. Jean*, 517 S.W.2d 596, 599 (Tex.Civ.App.-Houston [1st Dist.] 1974, writ ref'd n.r.e.) (unmarked termi-

still the same: the Department knew of the ponding and could have prevented the ponding in both instances. In both cases, the results were the same—a tragic loss of life.

### Issue Two

As noted, I concur in the majority's finding that the evidence is legally sufficient to sustain the jury's answer regarding the general premises defect. I disagree the evidence is factually insufficient. There was evidence TXDOT knew of the ponding in previous rains, knew of previous accidents due to the ponding, therefore it is more than a reasonable inference that TXDOT knew of the ponding on this particular day. I would overrule all of issue two.

### Issue Five

Issue Five is somewhat problematic. I agree it was error for the trial judge to

nation of dead end street four feet from

redact an exhibit admitted into evidence. However, I do not believe the error rises to the level of reversible. Tex.R.App. P. 44.1. As set out in the majority opinion, the jury heard evidence Mr. Fontenot was partially ejected from his vehicle. The jury assigned fifteen percent of the negligence to Mr. Fontenot. It is reasonable to assume they equated the partial ejection to not wearing a seat belt and factored this into their negligence assessment. I would overrule issue five.

I would reverse and render as to Deavers, Inc., but affirm as to TXDOT, with a remand to enter a new judgment.