**TEXAS DEPARTMENT OF TRANSPORTATION,**
Appellant,

v.

**Jimmy Don YORK, Individually and on behalf of the Estate of Rebecca York, Deceased and James R. Bodiford, Jr., Individually and on behalf of the Estate of Rebecca York, Tonya Bodiford, and Shirley Fowler, Appellees.**

No. 10–06–00210–CV.

Court of Appeals of Texas, Waco.

Aug. 8, 2007.

David B. Strain, Asst. Atty. General–Transportation Division, Austin, for appellant.

Chad B. Matthews, League City, Ron Butler, Marlin, for appellees.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.

## OPINION

BILL VANCE, Justice.

Family members of Rebecca York sued the Texas Department of Transportation (TxDOT), alleging a premises liability cause of action in their wrongful-death suit. A jury found TxDOT 100% at fault and $1,033,440 in damages. After applying the Texas Tort Claims Act's damages limitation, the trial court rendered a final judgment against TxDOT for $250,000. Asserting three issues, TxDOT appeals. We will affirm.

On October 29, 2003, at around 6:50 a.m., York, a nurse, was driving to work on FM 979 in Robertson County and lost control of her car while driving over loose aggregate (gravel) at a curve in the road. York's car crossed the center line and struck an oncoming pickup pulling a loaded trailer; she died at the scene. The day before on that road and on others in the area, TxDOT had performed "spot seal coat" applications (liquid asphalt and gravel); those applications were approximately 6½ feet wide and 18 to 20 feet long.

### Special Defect

The plaintiffs asserted that the loose gravel was a special defect and that the duty owed by TxDOT was that owed to an invitee. The trial court agreed and submitted the case to the jury on that basis.

In its first issue, TxDOT contends that the trial court erroneously denied its motion for JNOV. In support of this issue, TxDOT asserts that the road condition was not a special defect, but was an ordinary premise defect. TxDOT argues that the plaintiffs failed to obtain jury findings to support a claim based on an ordinary premise defect that imposed on TxDOT the duty owed to a licensee. Specifically, TxDOT states that the plaintiffs were required to, but did not, obtain jury findings that TxDOT had actual knowledge of the dangerous condition and that York lacked knowledge of the dangerous condition.

■ The duty owed by a governmental unit in a TTCA premises liability claim[1] is governed by section 101.022, which in 2003 provided:

(a) If a claim arises from a premise defect, the governmental unit owes to the claimant only the duty that a private person owes to a licensee on private property, unless the claimant pays for the use of the premises.

(b) The limitation of duty in this section does not apply to the duty to warn of special defects such as excavations or obstructions on highways, roads, or streets or to the duty to warn of the absence, condition, or malfunction of traffic signs, signals, or warning devices as is required by Section 101.060.

Act of May 17, 1985, 69th Leg., R.S., ch. 959, 1985 Tex. Gen. Laws 3303 (amended 2005) (current version at TEX. CIV. PRAC. & REM.CODE ANN. § 101.022 (Vernon Supp.

2006)). We recently addressed ordinary premise defects and special defects:

A governmental unit may be subject to premises liability for either ordinary premise defects or special defects. An ordinary premise defect is a condition of the premises which creates an unreasonable risk of harm. *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 237 (Tex.1992); *Tex. Dep't of Transp. v. Fontenot*, 151 S.W.3d 753, 760–61 (Tex.App.-Beaumont 2004, pet. denied); *Corbin v. City of Keller*, 1 S.W.3d 743, 748 (Tex.App.-Fort Worth 1999, pet. denied). Special defects are "excavations," "obstructions," or other conditions which "present an unexpected and unusual danger to ordinary users of roadways." *State Dep't of Highways & Pub. Transp. v. Kitchen*, 867 S.W.2d 784, 786 (Tex.1993) (per curiam) (quoting *Payne*, 838 S.W.2d at 238); *see also* TEX. CIV. PRAC. & REM.CODE ANN. § 101.022(b) (Vernon Supp.2006); *Fontenot*, 151 S.W.3d at 761; *Corbin*, 1 S.W.3d at 746.

For an ordinary premise defect, "the governmental unit owes to the claimant only the duty that a private person owes to a licensee on private property, unless the claimant pays for the use of the premises." TEX. CIV. PRAC. & REM.CODE ANN. § 101.022(a) (Vernon Supp.2006); *Payne*, 838 S.W.2d at 237; *Fontenot*, 151 S.W.3d at 760; *Corbin*, 1 S.W.3d at 747. Conversely, if the condition at issue constitutes a special defect, then the governmental unit owes the claimant the same duty that a private person owes an

---

1. TxDOT, a governmental unit, is immune from both suit and liability for York's death unless its immunity is waived by the terms of the Texas Tort Claims Act (TTCA). *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 101.021, 101.025 (Vernon 2005). The threshold inquiry in any TTCA suit is whether immunity has been waived under section 101.021, which states

that "[a] governmental unit in the state is liable for … personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." *Id.* § 101.021(2).

invitee. *Payne*, 838 S.W.2d at 237; *Fontenot*, 151 S.W.3d at 760–61; *Corbin*, 1 S.W.3d at 747.

Thus, for an ordinary premise defect, the governmental unit can be liable only if it has actual knowledge of the condition at issue and the plaintiff did not. *Payne*, 838 S.W.2d at 237; *Fontenot*, 151 S.W.3d at 761; *Corbin*, 1 S.W.3d at 748. For a special defect, the governmental unit can be liable if it knew or should have known of the condition. *Payne*, 838 S.W.2d at 237; *Fontenot*, 151 S.W.3d at 761. The plaintiff's awareness of the existence of a special defect is immaterial. *See Payne*, 838 S.W.2d at 237; *Fontenot*, 151 S.W.3d at 761; *Thompson v. City of Corsicana Housing Auth.*, 57 S.W.3d 547, 553 (Tex. App.-Waco 2001, no pet.).

"Whether a condition is a premise defect or a special defect is a question of duty involving statutory interpretation and thus an issue of law for the court to decide." *Payne*, 838 S.W.2d at 238; *Fontenot*, 151 S.W.3d at 761; *accord R.R. Street & Co. v. Pilgrim Enters., Inc.*, 166 S.W.3d 232, 240 (Tex.2005); *Corbin*, 1 S.W.3d at 747.

*Stewart v. City of Corsicana*, 211 S.W.3d 844, 848–49 (Tex.App.-Waco 2006, pet. filed) (footnote omitted). Thus, our standard of review on whether the condition is an ordinary premise defect or a special defect—a question of law—is de novo. *See State v. Rodriguez*, 985 S.W.2d 83, 85 (Tex. 1999); *State Dep't of Transp. v. O'Malley*, 28 S.W.3d 652, 655 (Tex.App.-Corpus Christi 2000, pet. denied).

▇▇ "A special defect must be a condition of the same kind or class as an excavation or roadway obstruction and present 'an unexpected and unusual danger to ordinary users of roadways.'" *Rodriguez*, 985 S.W.2d at 85 (quoting *Payne*, 838 S.W.2d at 238, and citing *County of Harris*

*v. Eaton*, 573 S.W.2d 177, 179 (Tex.1978)). However, the examples in the statute ("such as excavations or obstructions") are not exclusive, and we are to construe "special defects" to include defects of the same kind or class as the ones expressly mentioned in the statute. *City of Grapevine v. Roberts*, 946 S.W.2d 841, 843 (Tex.1997).

In this case, the TxDOT crew members testified that they had correctly performed the spot seal coat application, which consisted of three steps: (1) spraying liquid asphalt on the road; (2) spreading one layer of aggregate (gravel), consisting of crushed limestone; and (3) rolling the gravel into the asphalt by driving back and forth over it with a dump truck. The patches were inspected visually and by driving over them, and they looked good to the crew. It was undisputed that the asphalt did not hold the gravel to the road; one possible reason was a flaw in the asphalt's chemical composition. There was no signage warning of loose gravel.

Before York's accident, several other drivers had lost control of their cars in the same area, which was a curve on the road where the speed limit was 70 m.p.h. On the afternoon before York's accident, Brenda Barnett hit the gravel and "fishtailed," and later that evening, her husband, who was driving slow enough to watch for the gravel, also fishtailed. Also on that day, JoAnn Langford slid on the gravel and spun around, facing the ditch. Early the next day, and about thirty minutes before York's accident, Melody Henry hit the loose gravel in the curve and, similar to York, slid and lost control, veering across the oncoming lane and into the opposite bar ditch.

John Paul Moore, a volunteer fireman who was the first responder to arrive after York's accident, said that his feet slid on the loose gravel in the process of climbing into and down from the back of his truck.

Moore described the gravel as crushed white limestone, about one-quarter of an inch to three-quarters of an inch in diameter. He described to an investigator that the scene was like "walking on marbles" because that was all he could equate it to—the "pieces would actually slide and move." While Moore admitted that the gravel was not slick or round like a marble and that there was only one layer, it would "make you slip" when walking on it. Moore also observed recent skid marks that indicated other vehicles had lost control at the same scene.

William Rogillo, a Department of Public Safety Senior Corporal, investigated the accident with a DPS team that concluded York lost control because of loose gravel and her failure to control her speed on the loose gravel. Rogillo's team did skid testing to determine the coefficient of friction of the road surface. The loose gravel had been swept off the road at the time of the skid testing, so the first set of skid tests did not involve loose gravel and had results of .532 and .521. They then had the loose gravel placed back on the road, and a second set of skid tests had results of .387, .404, and .417. Although they attempted to duplicate the amount of loose gravel, Rogillo admitted that they "were unable to know for sure" whether the amount of gravel was the same as at the time of York's accident. Rogillo said that the lowest amount of friction (.387) was the friction expected on a wet road.

TxDOT asserts that the loose gravel in this case was not a special defect because it was not "extraordinarily slippery"—only ordinarily slippery—and it was not unusual or unexpected to York because she had crossed several other spots of loose gravel before her accident. TxDOT cites no authority that the loose gravel must have rendered the road "extraordinarily" slippery.[2] We note that at least one other court has found loose gravel to be a special defect: the Corpus Christi court found a special defect where the evidence showed a 200–foot–long stretch of curved roadway was covered with one-half cubic yard of loose gravel, and there was testimony of an excessive amount of loose gravel and the unsafe condition caused by the loose gravel.[3] *O'Malley*, 28 S.W.3d at 656 ("Like an excavation or obstruction, a roadway covered with an excessive amount of loose gravel is not something motorists can reasonably be expected to anticipate."). As it does in this case, TxDOT argued that even though there was gravel

---

**2.** TxDOT's "ordinarily slippery" argument also depends on its analogy between the loose gravel on the road and a wet road, but this analogy has a major flaw: a driver on a wet road knows that the road is wet and therefore slippery and can take precautions such as slowing down. There is nothing unexpected or unusual about a wet road being slippery. *See State Dep't of Highways v. Kitchen*, 867 S.W.2d 784, 786 (Tex.1993) (holding that ice on bridge during winter was not a special defect because it is not unexpected or unusual); *cf. State Dep't of Transp. v. O'Malley*, 28 S.W.3d 652, 656 (Tex.App.-Corpus Christi 2000, pet. denied) ("Like an excavation or obstruction, a roadway covered with an excessive amount of loose gravel is not something motorists can reasonably be expected to anticipate."); *State v. Wollesen*, 93 S.W.3d 910, 913 (Tex.App.Austin 2002, no pet.) ("Like an excavation or obstruction, a roadway covered with an excessive amount of loose gravel is unexpected and difficult to navigate."). In this case, with no loose-gravel signage, drivers would not know there was loose gravel on the curve that made the road either ordinarily or extraordinarily slippery, and it would thus be unexpected or unusual.

**3.** Albeit in apparent dicta, the Austin Court of Appeals affirmed the trial court's determination that loose gravel was a special defect. *Wollesen*, 93 S.W.3d at 913–14 ("Clearly, the presence of the loose gravel unexpectedly and physically impaired Wollesen's ability to travel on the road.").

on the road, the road still maintained very good traction, with a .665 coefficient of friction (much higher than in this case). *Id.* at 655–56. The court replied: "This may be true, but the existence of traction does not discount the unexpected nature of the excess gravel on the road." *Id.* at 656.

■ Based on the facts of York's accident and the other similar incidents at the same location, the evidence about the volume and looseness of the gravel, the absence of signage, and the questionable (but nondispositive) friction testing, we hold that the loose gravel on this road at this location was a special defect. And for these same reasons and based on this same evidence, we reject TxDOT's alternative contention that there is no evidence that the loose-gravel condition posed an unreasonable risk of harm, one of the elements of a premises liability cause of action. *See LMB, Ltd. v. Moreno,* 201 S.W.3d 686, 688 (Tex.2006). A condition poses an unreasonable risk of harm when there is a sufficient probability of a harmful event occurring that a reasonably prudent person would have foreseen it or some similar event as likely to happen. *County of Cameron v. Brown,* 80 S.W.3d 549, 556 (Tex.2002); *see also Hall v. Sonic Drive–In of Angleton, Inc.,* 177 S.W.3d 636, 645 (Tex.App.-Houston [1st Dist.] 2005, pet. denied) ("The determination of whether a particular condition poses an unreasonable risk of harm is generally fact specific.").

■ In reviewing the legal sufficiency of the evidence, we view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 807 (Tex.2005). There is legally insufficient evidence or "no evidence" of a vital fact when (a) there is a complete absence of

evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Id.* In this case there is more than a scintilla of evidence that the loose-gravel condition posed an unreasonable risk of harm. And to the extent TxDOT is asserting that *only* one layer of loose gravel on the curve of a road with a 70 m.p.h. speed limit does not pose an unreasonable risk of harm, we reject that argument on its face.

Because the trial court properly submitted the case to the jury as a special defect, it did not err in denying TxDOT's motion for JNOV. We overrule the first issue.

### No Duty

■ TxDOT's second issue asserts that the trial court erroneously denied its motion for JNOV because the loose-gravel condition was open and obvious and TxDOT thus owed no duty to York if she was a licensee. In *Parker v. Highland Park, Inc.,* 565 S.W.2d 512, 521 (Tex.1978), the no-duty doctrine as to invitees was abolished. Because we have found the loose gravel condition to be a special defect and TxDOT's duty was that owed an invitee, the no-duty doctrine is inapplicable, and we overrule issue two.

### Actual or Constructive Knowledge

■ In its third issue, TxDOT asserts that the trial court erroneously denied its motion for JNOV because there was no

evidence TxDOT had actual or constructive knowledge of the loose gravel condition. For a premises-liability claim involving an invitee, it must be proved that the premises owner knew (actual knowledge) or should have known (constructive knowledge) of the condition. *State Dep't of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 237 (Tex.1992); *Tex. Dep't of Transp. v. Fontenot,* 151 S.W.3d 753, 761 (Tex.App.-Beaumont 2004, pet. denied); *see LMB, Ltd. v. Moreno,* 201 S.W.3d 686, 688 (Tex.2006). TxDOT claims that the gravel was not loose or had not become unstuck when its crew left the area, but the record does not support that assertion.

■■■ The fact that TxDOT created the loose gravel condition does not automatically mean that TxDOT had actual knowledge of it. But, "the fact that the owner or occupier of a premises created a condition that posed an unreasonable risk of harm may support an inference of knowledge. . . . Creating the condition does not establish knowledge as a matter of law for purposes of premises liability, however, creation of the condition is circumstantial evidence of knowledge." *Burns v. Baylor Health Care Sys.,* 125 S.W.3d 589, 599 (Tex.App.-El Paso 2003, no pet.) (citing *Keetch v. Kroger Co.,* 845 S.W.2d 262, 265–66 (Tex.1992)). This circumstantial evidence is some—more than a scintilla of—evidence of TxDOT's actual knowledge. We next turn to constructive knowledge.

■■■ Constructive knowledge can be established by showing that the condition had existed long enough for the owner to have discovered it *upon reasonable inspection. CMH Homes, Inc. v. Daenen,* 15 S.W.3d 97, 102–03 (Tex.2000); *see also Harris County v. Eaton,* 573 S.W.2d 177, 180 (Tex.1978). Thus, we focus on whether there is some evidence that TxDOT should have discovered the loose gravel condition upon reasonable inspection.

James Marek, one of the TxDOT crew members, said that he inspected the patch by looking at it and that it looked good—there was no "significant loose aggregate"—but he did not walk on it. David Maresch, the dump truck driver, rolled over the gravel to pack it and looked at it, noticing that there was "some" ("just a few rocks") "loose aggregate," which he said was normal. David Polk III disagreed with Maresch, saying that he did not notice any loose rock and said it "looked pretty good," yet admitting that in his deposition he had testified that he couldn't recall the job, though he said he later recalled it upon reviewing his written statement. None of the crew testified about what time of day they were working on FM 979, and nothing in the record supports the assertion in TxDOT's brief that the loose gravel condition "did not arise until after normal business hours."

York's accident happened early on the morning of October 29. On the afternoon (just after 5:00 p.m.) of the day the patch work was done—the day before York's accident—Brenda Barnett hit the gravel and her car "fishtailed." Later that evening, Barnett was on the same road with her husband, who was driving slow enough to watch for the gravel because she had told him about it, also fishtailed on the loose gravel. Also on that day (the record does not reflect the time of day), JoAnn Langford slid on the loose gravel on the curve where York lost control, and Langford's car spun around, facing the ditch on the other side of the road.

Viewing the evidence in the light favorable to the verdict, we hold that there is more than a scintilla of evidence that TxDOT had constructive knowledge of the loose gravel condition. In addition to the circumstantial evidence arising from

TxDOT's creation of the condition, the evidence recited above about TxDOT's inspection, and the similar accidents on the same day the patch work was done, reasonable and fair-minded jurors could conclude that TxDOT could have discovered the loose gravel upon reasonable inspection. We overrule TxDOT's third issue.

### Postjudgment Interest

In a cross-point, York's family members assert that the judgment should be reformed to apply the postjudgment interest rate of 8%. *See* Tex. Fin.Code Ann. § 304.003 (Vernon 2006). TxDOT agrees. We thus modify the judgment to reflect a postjudgment interest rate of 8%. As modified, the judgment is affirmed.

TOM GRAY, Chief Justice.

### SPECIAL NOTE

On Friday, August 3, 2007 at 4:02 p.m., a date he knew I was not in the office,[1] Justice Vance sent the following email to me and copied Justice Reyna and others:

> Some time back, we agreed to notify you in advance of the issuance of an opinion without your response under the deadlines.
>
> The Final Response Date for York was August 1, so the opinion will issue as a unanimous opinion on August 8. (Para. 4.01, "failure to act by [the Final Response Date] constitutes approval of the draft opinion ... to be issued.")

(Insert and deletions as in original.) I responded as follows on Monday, August 6, 2007 at 8:29 a.m.:

> Bill
>
> This is wrong, on many levels.

> Twg
>
> Felipe,
>
> If you empower Bill by voting with him to do this, it is just wrong. I have spent days in research and drafting but it is not yet complete. I gave a response, which is still my response if the opinion is going to issue. And this representation to the public is false.
>
> twg

I received no response from either Justice Vance or Justice Reyna before the opinion was issued on August 8, 2007. Notwithstanding their knowledge that I did not join the opinion, it was issued, and for all intents and purposes would appear to the public and the parties, as if it was a unanimous opinion of this Court. It is not.

What is attached as an appendix to this Special Note is the status of my draft and indicates the status of my research at the time I received Justice Vance's email and sent my response. Because there is no point in concluding it at this juncture, I have attached it to show some of the complexities of the issues that are otherwise being ignored. It is presented as it then existed with all the warts of a rough draft before and without any editing. It stops in mid-sentence, as did the draft.

With this Special Note, I do not join in the opinion or judgment of the Court, and because I do not know where the research would have led me, I do not know if it would result in a concurring or dissenting opinion. *See Johnson v. Baylor Univ.,* 188 S.W.3d 296, 311–312 (Tex.App.-Waco 2006, pet. denied) (Special Note by Chief Justice Gray); *Jones v. State,* 188 S.W.3d 737, 738–739 (Tex.App.-Waco 2006, no pet.) (Special Note by Chief Justice Gray); *Tex.*

---

1. One of several reasons I was absent was so the carpet in my office could be cleaned rather than unnecessarily replaced, as a majority of the Court has voted regarding replacement of carpet for their own offices and the courtroom at a price tag to the taxpayers of almost $20,000.

*Genco, LP v. Valence Operating Co.,* 187 S.W.3d 118, 125–126 (Tex.App.-Waco 2006, pet. denied) (Special Note by Chief Justice Gray issued Jan. 25, 2006); *see also Krumnow v. Krumnow,* 174 S.W.3d 820, 830–842 (Tex.App.-Waco 2005, pet. denied) (Special Note by Chief Justice Gray issued Aug. 31, 2005).

### APPENDIX

This case has consumed an inordinate amount of my time. I have read and studied many cases on the waiver of sovereign immunity in the context of premises liability. Of particular importance in its application to the facts of this case is the limited extension of the waiver when a licensee has been injured as the result of a special condition.

What I found of extraordinary interest is how far the case law has strayed from what seems to be the clear structure of the statute. I tried to reconcile the cases with the statute but could not. While I am bound by the Supreme Court precedent interpreting the statute, which I will discuss in the second part of this opinion, if I were writing on a clean slate, the diagram for the State's waiver that I would draw would be very different. In this regard, I will discuss the statute, standing alone, in the first part of this opinion. And in the third part I will discuss the particular facts of this case. And then I will come to a conclusion applying the facts of this case to the law as defined in the Supreme Court cases interpreting and applying the statute.

### PART I

#### The Statute

The statute is often cited. But to appreciate the true simplicity of its design and application, it must be closely studied. The first relevant statute is the general waiver of sovereign immunity which, generally, each litigant must bring themselves within to successfully sue the State of Texas or a political subdivision of the State. It provides:

§ 101.021. **Governmental Liability**

A governmental unit in the state is liable for:

(1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:

(A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and

(B) the employee would be personally liable to the claimant according to Texas law; and

(2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

TEX. CIV. PRAC. & REM.CODE § 101.021.

To boil this statute down to the portions directly applicable to the facts of this case, we have the following:

A governmental unit in the state is liable for ... personal injury ... and death so caused by a condition or use of ... real property if ... a private person [would] be liable ... according to Texas law.

*Id.* Basically, this makes the State liable like and under the same circumstances as any other property owner (including any other occupier of the property legally responsible for the condition thereof) in the State.

But recognizing that under the common law, the duty owed by a property owner was dependent upon the circumstances under which the person entered upon the

property, and recognizing the difficulty of establishing that status as between a government and the public, the legislature attempted to clarify that status, or more particularly, tried to clarify the duty the State would owe to the public. This attempt at clarification was by reference to the common law's terminology of the status of the person when they entered upon the land. The common law categorized entrants as one of the following:

1. Trespasser

2. Licensee

3. Invitee

The statute, however, only refers to one of these categories and by doing so seems to establish the lowest duty owed by the State to a member of the public as that duty owed to a licensee. The duty owed as a premise owner of property is set out, including limitations, as follows:

## § 101.022. Duty Owed: Premise and Special Defects

(a) Except as provided in Subsection (c), if a claim arises from a premise defect, the governmental unit owes to the claimant only the duty that a private person owes to a licensee on private property, unless the claimant pays for the use of the premises.

(b) The limitation of duty in this section does not apply to the duty to warn of special defects such as excavations or obstructions on highways, roads, or streets or to the duty to warn of the absence, condition, or malfunction of traffic signs, signals, or warning devices as is required by Section 101.060.

(c) If a claim arises from a premise defect on a toll highway, road, or street, the governmental unit owes to the claimant only the duty that a private person owes to a licensee on private property.

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985. Amended by Acts 2005, 79th Leg., ch. 281, § 2.88, eff. June 14, 2005.

Tex. Civ. Prac. & Rem.Code § 101.022.

So the basic duty for all property is that owed to a licensee. § 101.022(a). But if the claimant paid for the use of the premises, the claimant was not owed the duty of a licensee. By referring to whether a payment was made for the "use of the premises," it appears, and has been so construed, that such a claimant is accorded the duty owed an invitee. [cite] To avoid invitee status to persons who paid a toll for the use of a road, however, subsection (c) limits the duty owed to that of a licensee.

The truly interesting provision, and the one which has caused immeasurable uncertainty based on the plethora of cases which have struggled with, is subsection (b). First, it will be noted that it is phrased as the section being one of limitation—"the limitation of duty in this section." It is not at all clear how subsection (a), which is the only other subsection that existed until 2005, limits any duty unless the claimant who pays for something other than for the "use of premises" is, nevertheless, relegated to licensee status.

In this regard, a person going to a driver's license office who was injured by a condition on the premises would be "limited" to "licensee" status rather than having the benefit of "invitee" status, even though they entered the premises and paid for the driver's license. But whatever the limitation is, we know that it "does not apply to the duty to warn of special defects such as excavations or obstructions on highways, roads, or streets . . . ." § 101.022(b).

It again should be noted that the exception to the limitation, like the exception in subsection (a) for a claimant who "pays for the use of the premises," does not specify what status will be assigned to the claim-

ant. But what it specifically tells us is that the limitation of the section "does not apply to the duty to warn of special defects." The only logical way to read this exception to the limitation is not that the status of the claimant changes, but that the limitation on the duty to that of a licensee still applies to the claimant. But regardless of that status, the State nevertheless owes to that claimant a "duty to warn of special defects such as excavations or obstructions."

So in summary, it breaks down like this:

1. A person who pays for the use of the premises is owed the highest duty, presumably that of an invitee;

2. For a special defect, the claimant is owed the duty to warn of the special defect and otherwise is owed the duty of a licensee;

3. For all other claimants for premises defects from the State, including those who paid a toll for the use of a road, the State's duty is that owed to a licensee.

This comes from an analysis of the statute without regard to the case law. It is a fairly simple statute to apply if it is interpreted in this manner. It has not been interpreted in this manner.

## PART II

### OH, THE CASES

The number of cases construing or applying the TTCA (Texas Tort Claims Act) are too numerous to even list, much less to discuss them in detail. The primary focus of this part of the opinion will be to address some of the more significant, albeit inadvertent, turns that the interpretation of the section of primary interest have made.

We begin with *Harris County v. Eaton,* 573 S.W.2d 177 (Tex.1978). The question in this case was whether an abnormally large hole in a road was an excavation, thus making it a special defect. Though the case was construing the predecessor to the current statute, it had the same proviso in it that is now contained in subsection 121.022(b). The statute stated:

Provided, however, that the limitation of duty contained in this subsection [limiting the duty to that of a licensee] shall not apply to the duty to warn of special defects such as excavations or obstructions on highways, roads, or streets, . . . .

The court, after some other significant discussion of the scope and application of the statute, goes on to discuss the "proviso." The court states that:

The proviso . . . was meant to enlarge the liability in some instances by imposing *the duty to warn* when there was a special defect. Accordingly we hold that the abnormally large hole was a special defect and the County had the duty to warn *as in* the case of a duty one owes to an invitee.

It was undisputed that Harris County had provided no warning.

From this case we fast forward 14 years, an entirely new Supreme Court, a recodified statute and